UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 3:11-cr-81-J-34JBT

KESSLER HOLZENDORF

_____/

## AMENDED REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Kessler Holzendorf's ("Mr. Holzendorf")

Motion to Suppress Illegally Obtained Oral Statements, Motion for Evidentiary

Hearings and Incorporated Memorandum of Law ("Motion") (Doc. 68) and the United

States's Response in Opposition thereto ("Response") (Doc. 78). The Court held an

evidentiary hearing on the Motion on November 18, 2011 and on December 9, 2011.

For the reasons set forth herein, the undersigned recommends that the Motion be

**DENIED**.[2]

---

[1] Within fourteen days after service of this document, specific, written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local Rules, United States District Court, Middle District of Florida. Failure to file a timely objection waives a party's right to review. Fed. R. Crim. P. 59.
    If the parties object to the Amended Report and Recommendation, they must file new objections even if they are identical to the objections already filed in regards to the original Report and Recommendation. (Doc. 105.)

[2] This Amended Report and Recommendation is identical to the original Report and Recommendation except for this footnote and new footnote nine and as noted therein, the consequent renumbering of footnotes, and as noted in Part IV herein.

## I. Issues Presented and Summary of Recommendation

On the afternoon of August 2, 2010, Mr. Holzendorf drove himself to the Federal Bureau of Investigation ("FBI") Jacksonville field office where he was interviewed by FBI Special Agent ("S.A.") Blanca Sanchez-Gilbert and Florida Department of Law Enforcement ("FDLE") S.A. Greg Holycross regarding a mortgage fraud investigation concerning Mr. Holzendorf and others. (*See, e.g.*, Tr. 20, 28, 37, 107.) This was Mr. Holzendorf's second interview by the agents. The first encounter took place on June 29, 2009 at the home of Mr. Holzendorf and his partner Mark Gruszecki ("Mr. Gruszecki"). (Holz Tr. 3-4.)[3] On April 13, 2011, Mr. Holzendorf was indicted for conspiracy to commit mail and wire fraud, mail fraud, and wire fraud. (Doc. 1.)

In the Motion, Mr. Holzendorf claims that the statements he made on August 2, 2010, along with any evidence obtained as the fruit of such statements, should be suppressed for two reasons. First, he claims that pursuant to Fed. R. Crim. P. 11(f), his statements were "made in the course of plea discussions," Fed. R. Evid. 410, and are therefore inadmissible. Second, and alternatively, he claims any statements were the product of an involuntary confession in violation of the Due Process Clause. (Doc. 68.) The Court rejects both grounds for suppression.

---

[3] The Court will refer to the transcript of Defendant's testimony (direct examination only) on November 18, 2011, filed as Doc. 90, as "Holz Tr. [page number]." The transcript of the rest of the proceedings on November 18, 2011, filed as Doc. 91, will be cited as "Tr. [page number]." The transcript of the proceedings on December 9, 2011 will be cited as "Suppl. Tr. [page number]."

Regarding the first argument, Mr. Holzendorf's statements were not "made in the course of plea discussions with an attorney for the prosecuting authority," Fed. R. Evid. 410, or with any agent for the government who had actual or apparent authority to negotiate a plea deal. Moreover, even under a "totality of the circumstances" approach, *United States v. Robertson*, 582 F.2d 1356 (5th Cir. 1978) (en banc), Defendant did not exhibit a subjective expectation to negotiate a plea and even if he did, any such expectation was unreasonable. Thus, Rule 11(f) is inapplicable.

Regarding the second argument, Mr. Holzendorf's statements were not the product of an involuntary confession because the credible evidence does not support Defendant's allegations of deception or coercion on the agents' part, but rather shows that Defendant made a conscious, voluntary, and knowing decision to talk with the agents without the assistance of counsel. Further, the interview itself was in no way coercive or improper. Thus, the government has satisfied its burden of proof on both issues.

In reaching these conclusions, the Court has considered the evidence presented by both sides and largely accepts the government's version of the significant events on August 2, 2010 because the agents' testimony was significantly more credible than the Defendant's testimony. Accordingly, the Court will recommend that the Motion be denied.

## II. Testimony and Other Evidence

The government called S.A. Holycross to the stand. Defendant called three witnesses: S.A. Sanchez-Gilbert; Charles Truncale, Esquire ("Mr. Truncale"); and Mr. Holzendorf. Both sides admitted various exhibits into evidence.[4]

### A. The Government's Version of the Events Based on the Testimony of S.A. Holycross and S.A. Sanchez-Gilbert

To the extent the testimony of the two agents overlaps, their statements will not be discussed separately. S.A. Holycross was the government's only witness and he took the stand first. He testified that he has been with the FDLE for twelve years and that his "primary job is a task force officer at the FBI on mortgage fraud and health care fraud" where his primary co-case agent is S.A. Sanchez-Gilbert. (Tr. 5-6.) S.A. Holycross then testified regarding the events that transpired on August 2, 2010.

On August 2, 2010, S.A. Holycross was working with S.A. Sanchez-Gilbert who, at the time, was seven or eight months pregnant. (Tr. 6, 8.) On that day, the agents went to Mr. Holzendorf and Mr. Gruczecki's residence in Mandarin to ask Mr. Holzendorf some questions about their pending investigation. (Tr. 8.) Mr. Holzendorf was not at home, but Mr. Gruszecki was there and he answered the

---

[4] Except where otherwise noted, the Court is relying for its fact finding on the actual evidence presented at the hearings, rather than on the recitation of facts in the Motion or Response. The Court notes inconsistencies in both the Response and Motion with the evidence presented. However, unless a specific witness was impeached with statements made in the Response or Motion, the Court does not consider any such inconsistencies as bearing on the credibility of any particular witness.

door.  (*Id.*)  Mr. Gruszecki told the agents he thought he was having an allergic reaction.  (*Id.*)  Mr. Gruszecki proceeded to call his doctor's office[5] and after he made the call and told the agents he was fine, they asked him to tell Mr. Holzendorf to call them.  (Tr. 9.)  Mr. Gruszecki told the agents they could call Mr. Holzendorf on his cell phone and voluntarily gave them the number.  (Tr. 9-10, 90.)

During the agents' visit to the residence, which lasted fifteen to twenty minutes, the legal representation of Mr. Holzendorf and Mr. Gruszecki was never discussed.  (Tr. 10.)  Specifically, S.A. Sanchez-Gilbert testified that Mr. Gruszecki did not tell them that Mr. Holzendorf was allegedly represented by Charles Lembcke ("Mr. Lembcke") or anyone else at that time.  (Tr. 102-03.)  She also testified that because they knew that Mr. Gruszecki was represented by Mr. Lembcke, the agents did not interview him.  (Tr. 101-02.)  The agents left the residence and headed toward the FBI office[6] at or near noon.[7]  (Tr. 10-11.)

---

[5] The call to Mr. Gruszecki's doctor's office was allegedly placed at 1:32 p.m.  (*See* Tr. 30.)  S.A. Sanchez-Gilbert testified that she dialed the number because Mr. Gruszecki was shaking and could not place the call.  (Tr. 58.)

[6] The address of the FBI field office is 6061 Gate Parkway, Jacksonville, FL 32256.

[7] Cell phone records indicate that the time they left the residence was probably closer to 1:30 p.m.  (*See* Def.'s Ex. 2.)  At the hearing, the Court took judicial notice that the difference between Greenwich Mean Time ("GMT") and Eastern Daylight Savings Time was four hours on August 2, 2010, not five hours as testified to by S.A. Sanchez-Gilbert. (Suppl. Tr. 73.)  The government did not oppose this request for notice and conceded this point.  Thus, the times indicated on Mr. Holzendorf's cell phone records (Def.'s Ex. 5) and S.A. Sanchez-Gilbert's cell phone records (Def.'s Ex. 2) were consistent and show that the agents were mistaken in their estimates of time.  As discussed herein, the Court does not find that such errors substantially detract from the agents' overall credibility regarding the
(continued...)

While S.A. Holycross was driving the vehicle (Tr. 10), S.A. Sanchez-Gilbert made a five-minute phone call to Mr. Holzendorf to see if he could meet with them at his convenience.[8] (Tr. 11, 13, 59, 103-04.) She asked him if he was represented by an attorney and his response was no. (Tr. 68-69.) She "told him that we had gotten information that Mr. Truncale no longer represented him." (Tr. 69.) She asked him if that was accurate, and he said it was. (Tr. 68-69.)[9] She testified that they "reiterated that point several times." (Tr. 69.)

Mr. Holzendorf agreed to meet with the agents the same day if he could reschedule his meetings with clients. (Tr. 13-14, 92, 103-04.) The agents offered to go back to Mr. Holzendorf's home or any other place convenient for him. (Tr. 13-14, 103-05.) S.A. Sanchez-Gilbert testified that she did not tell him that he could not have an attorney present and he did not tell her that he wanted to speak to a lawyer. (Tr. 104.) She also testified that during that phone conversation and during the later interview, a plea deal was never mentioned. (*Id.*) S.A. Sanchez-Gilbert admitted speaking to Assistant United States Attorney ("AUSA") Kevin Frein ("Mr. Frein"), on the phone after her telephone conversation with Defendant and prior to Defendant's

---

[7](...continued)
significant matters and statements made on August 2, 2010.

[8] S.A. Sanchez-Gilbert testified that she made that call at 12:40 p.m. (Tr. 59-60, 93-94.) However, as explained *supra* note 6 and based on the phone records, the Court finds that the time was 1:40 p.m. (*See* Tr. 59-60, 94-95; Def.'s Ex. 2.)

[9] The two sentences immediately preceding this footnote have been added to the original Report and Recommendation.

interview, but denied that they discussed the possibility of making a plea deal with Defendant. (Tr. 64-65.) The agents testified that Mr. Holzendorf at some point indicated that he would meet with them that day at the FBI field office (Tr. 104-05) because he was in the Southside area (Tr. 14-15; *see also* Tr. 91-92).[10]

Upon Mr. Holzendorf's arrival at the FBI field office, at 2:25 p.m. (Tr. 20, 37), the receptionist called S.A. Sanchez-Gilbert and both agents went to the lobby area to greet Mr. Holzendorf. (Tr. 15-16, 37, 105.) The agents testified that Mr. Holzendorf was "[v]ery pleasant, very cooperative," and his speech was "very articulate, very normal" during the entire interview. (Tr. 16, 105.) The agents escorted Mr. Holzendorf from the lobby through two coded doors into an interview room. (Tr. 16.) The room had a desk and three rolling chairs, and no windows. (Tr. 17-18.) The door was closed but unlocked during the entire interview. (Tr. 18.) The

---

[10] S.A. Sanchez-Gilbert testified that Mr. Holzendorf called her back and told her that he was going to meet with them. (Tr. 64.) However, neither her phone records nor Mr. Holzendorf's phone records indicate that he made that call. (*See* Gov't's Ex. 2; Def.'s Ex. 5.) On direct examination by Mr. Lembcke, S.A. Sanchez-Gilbert speculated that Mr. Holzendorf could have made the call from a different phone. (Tr. 64.) The absence of a record of this call, and the close timing between the telephone conversation between Mr. Holzendorf and S.A. Sanchez-Gilbert and Mr. Holzendorf's arrival at the FBI office, do tend to corroborate Mr. Holzendorf's version of the events that there was only one call between him and S.A. Sanchez-Gilbert, and during that call, S.A. Sanchez-Gilbert "said they were heading back to the FBI headquarters, she asked me how soon I could be there. And I said, well, you know, about 20, 30 minutes" (Holz Tr. 16-17). However, the Court still does not find Mr. Holzendorf's testimony that S.A. Sanchez-Gilbert made that statement, particularly in a coercive manner, credible. The Court believes it more likely that either S.A. Sanchez-Gilbert is mistaken that there was a second call, and that Mr. Holzendorf actually indicated on the first call he would voluntarily come to the FBI office if he could reschedule his clients, or that possibly Mr. Holzendorf did make a second call from a different phone.

two coded doors were also unlocked from the inside. (Tr. 18-19, 38-39.) During the interview, S.A. Sanchez-Gilbert sat across the rectangular desk from Mr. Holzendorf, and S.A. Holycross sat to the side of S.A. Sanchez-Gilbert, at the corner of the table. (Tr. 20, 39-40.) The door was behind S.A. Sanchez-Gilbert's back. (Tr. 40.) Neither agent ever displayed any weapon and S.A. Sanchez-Gilbert did not have a firearm on her. (Tr. 20-21, 105.)

The interview started at 2:35 p.m. and took approximately two to two-and-a-half hours.[11] (Tr. 20, 28, 107.) Before asking any questions, the agents again inquired if Mr. Holzendorf had an attorney and he answered that he did not.[12] (Tr. 21, 25, 68-69, 106.) The agents also told Mr. Holzendorf that he could leave the interview at any time and he could refuse to answer their questions. (Tr. 22-23, 105-06.) He indicated he understood and answered their questions appropriately. (Tr. 106.) The agents testified that Mr. Holzendorf remained "friendly and cooperative," and "[v]ery alert" during the entire interview. (Tr. 25, 28, 88, 107.)

Both agents testified that there were no discussions about a potential plea

---

[11] S.A. Holycross testified that he did not recall S.A. Sanchez-Gilbert making or receiving any phone calls during the interview, only that she took a break at one point, during which S.A. Holycross and Mr. Holzendorf remained in the interview room. (Tr. 26-27.) S.A. Sanchez-Gilbert stated that she did not call the United States Attorney's Office ("USAO") during the interview. (Tr. 107-08.)

[12] Mr. Truncale had told the USAO that he did not represent Mr. Holzendorf. (Tr. 69.) S.A. Sanchez-Gilbert testified that she did not know whether Mr. Holzendorf was looking for an attorney before she interviewed him. (Tr. 70.) She also testified that if she thought or knew he was represented by an attorney, the agents would never have attempted to interview him. (*Id.*)

bargain and that Defendant did not bring up the topic of a plea agreement or a plea proposal during the interview.  (Tr. 28, 45-46, 86, 107.)  S.A. Sanchez-Gilbert testified that she and S.A. Holycross did not go to Mr. Holzendorf's residence to negotiate a plea agreement and that they were not given authority to do so by the USAO.  (Tr. 102, 108.)  In addition, during the interview, Defendant was not promised anything and was not threatened.  (Tr. 107.)  Further, Defendant did not tell the agents that he was willing to plead guilty to any crime.  (Tr. 107.)  Although he wound up making some incriminating statements, he was largely attempting to deflect blame and culpability to others.  (Tr. 86-88.)

Mr. Holzendorf told the agents that "he would be willing to talk about the other people in the case with the exception of Mr. Gruszecki [and] that he would not testify against Mr. Gruszecki under any circumstances."  (Tr. 27, 43-44; *see also* Tr. 86-88.)  S.A. Sanchez-Gilbert testified that this topic came up because Mr. "Holzendorf was pretty adamant that [the agents] had this wrong and that him and [Mr. Gruszecki] were not the only ones that had done something wrong and that [the agents] were trying to put it on them, and that there were other people that were involved."  (Tr. 86-87.)  At that point, S.A. Sanchez-Gilbert told Mr. Holzendorf that he could not choose against whom he would testify.  (Tr. 88.)  Mr. Holzendorf's response was that he would not testify against Mr. Gruszecki because they were life partners.  (*Id.*)

According to S.A. Holycross's testimony, the purpose of the interview was to discuss additional financial records the agents had obtained, including certain

checks written by Mr. Holzendorf, and information about Morrison Homes and its employees David Ray and Paul Masciarelli. (Tr. 31, 33.) Although Mr. Holzendorf was not questioned about the subject checks (Tr. 33, 53), he was questioned about Morrison Homes. (Tr. 33.) The agents testified that Mr. Holzendorf talked about the illegal acts committed by Maitland Mortgage that he was not a part of and acknowledged that "both he and Maitland Mortgage were guilty of fraud as to [a particular] transaction." (Tr. 46-47, 72-73.)

S.A. Sanchez-Gilbert testified that they wanted to talk with Mr. Holzendorf in more detail about the areas they had previously discussed with him in light of new information obtained from other individuals. (Tr. 72-73, 79-80.) She stated that in addition to new information about Maitland Mortgage, they also found out that day from Mr. Holzendorf about $5,000 kickbacks. (Tr. 73-74.)

The agents testified that when the interview was over, they walked Mr. Holzendorf out to the lobby area where the lights were still on and the receptionist was still there.[13] (Tr. 28-29, 89.) S.A. Holycross testified they instructed Mr. Holzendorf to take his badge, which is more like a name tag, to the receptionist's window. (Tr. 49-51.) Throughout their entire dealings with Mr. Holzendorf that day, he never displayed any anger and remained very pleasant, friendly, cooperative, articulate, and alert. (Tr. 16, 25, 28, 88, 105, 107.)

_____

[13] According to the agents' testimony, the reception area normally shuts down at 5:00 p.m. (Tr. 29, 89.) The first activity on Mr. Holzendorf's cell phone after the interview was at 5:28 p.m. (Def.'s Ex. 5.)

## B. Defendant's Version of the Events Based on the Testimony of Mr. Holzendorf[14]

Mr. Holzendorf is 42-years-old and has a Bachelor of Science degree from the University of North Florida. (Suppl. Tr. 27.) He testified that his first encounter with S.A. Holycross and S.A. Sanchez-Gilbert occurred on June 29, 2009 when they came to his and Mr. Gruszecki's residence. (Holz Tr. 3-4.) At that time, Mr. Holzendorf did not have counsel. (Holz Tr. 4.) His understanding from that encounter was that the agents were accusing him of being involved in the federal crime of mortgage fraud, but he answered their questions. (Suppl. Tr. 31-32.)

Immediately following Mr. Holzendorf's interview on June 29, 2009, the agents interviewed his life partner, Mr. Gruszecki. (Holz Tr. 4.) During Mr. Gruszecki's interview, Mr. Holzendorf went to a different room and searched online for a federal criminal defense attorney in Jacksonville, Florida. (*Id.*) He pulled up Mr. Truncale's web page and called him. (*Id.*) During the phone call, Mr. Truncale advised Mr. Holzendorf to stop Mr. Gruszecki from answering any additional questions, which he attempted to do, but Mr. Gruszecki decided to finish his conversation with the agents. (Holz Tr. 4-5.) Mr. Holzendorf testified that after this first encounter with the agents and his phone conversation with Mr. Truncale, he knew that he did not have to speak to law enforcement and that if he did, anything he said could be used against him. (Suppl. Tr. 36-37.)

---

[14] Although Mr. Truncale, a practicing attorney, testified for the defense, he was not a part of any of the events on August 2, 2010. His testimony is also discussed herein.

When the agents left his residence on June 29, 2009, Mr. Holzendorf had a more detailed discussion with Mr. Truncale by phone about the investigation and about possibly retaining Mr. Truncale as his and Mr. Gruszecki's counsel. (Holz Tr. 5.) A meeting was set up for the next day so that they could sign a contract to that effect, but Mr. Holzendorf never signed the contract. (*See, e.g.*, *id.*) Instead, he set up an appointment with Mr. Lembcke, and then called Mr. Truncale to cancel their appointment, indicating that his parents were going in a different direction as far as hiring an attorney. (*Id.*)

Mr. Holzendorf testified that he and Mr. Gruszecki met with Mr. Lembcke on August 7, 2009, and retained him as their legal counsel. (Holz Tr. 6-7.) Mr. Lembcke represented them with respect to a grand jury subpoena served on Mr. Gruszecki in September 2009 and a subpoena *duces tecum* served on Mr. Holzendorf after February 23, 2010, which Mr. Lembcke moved to quash.[15] (*Id.*) Mr. Holzendorf testified that Mr. Lembcke has continuously represented him since August 7, 2009. (Holz Tr. 7.)

He further testified that by August 2, 2010, he was aware that the government had either charged or indicted individuals he knew that were involved in real estate

---

[15] The subpoena *duces tecum*, which was dated February 23, 2010, directed to Home Improvements and Repair By Design ("HIRD"), and issued by the Federal Public Defender's Office in Christopher Reid's case, was admitted into evidence as Defendant's Exhibit 1. (Holz Tr. 6.) However, that subpoena, a hearing regarding the motion to quash, and all related records were sealed and, thus, the USAO could not have been aware of Mr. Lembcke's representation of Mr. Holzendorf as a result of his efforts regarding that subpoena (Suppl. Tr. 33-34).

transactions.  (*Id.*)  In fact, he was tracking the electronic filings in these and other mortgage fraud cases by checking the Public Access to Court Electronic Records ("PACER") website anywhere from twenty to forty times per day.  (Tr. 87; Holz Tr. 8-9; Suppl. Tr. 33.)  Based on his research, he figured out that the grand jury usually met on Wednesday or Thursday to issue an indictment, and "the majority of the people were always arrested on Monday."  (Holz Tr. 9.)  He also testified that by August 2, 2010, a Monday, he "had been eight months straight waking up about 4 o'clock in the morning -- [he has] a security system that covers the house 360-degrees plus street both left and right. [He] would just sit there and stare and wait on Monday mornings usually from about 5 to 8 o'clock, waiting for the FBI to come."  (*Id.*)

During the time in question, Mr. Holzendorf was under the care of both a psychiatrist and a psychologist for his bipolar disorder and was taking Wellbutrin (300 milligrams) and Xanax (1 milligram).[16]  (Holz Tr. 10-11; Suppl. Tr. 38.)  Despite taking these medications, he could function normally.  (Suppl. Tr. 38-39.)  On August 2, 2010, Defendant took Wellbutrin but not Xanax because on the weekends he would not take Xanax so that he could be awake on Monday mornings to watch his cameras.  (Holz Tr. 11.)  He would take Xanax "if the situation gets too stressful" (*Id.*), but he did not have any reason to take it at any time on August 2, 2010 (Suppl

---

[16] In general, Wellbutrin is used for the treatment of depression, and Xanax is used to treat anxiety disorders and panic disorder.  *See, e.g.*, U.S. National Library of Medicine, National Institutes of Health, available at http://www.nlm.nih.gov/.

Tr. 40-41).

At 1:38 p.m. that day, while Mr. Holzendorf was driving to a client meeting, he received a phone call from Mr. Gruszecki who told him that FBI agents were looking for him, and they had asked for his number and whether he had an attorney. (Holz Tr. 12-14.) While Mr. Holzendorf was still on the phone with Mr. Gruszecki, at 1:40 p.m., S.A. Sanchez-Gilbert called Mr. Holzendorf's number and Mr. Holzendorf picked up the call. (*Id.*) S.A. Sanchez-Gilbert asked him if he had an attorney; he testified that his response was: "yes, Charles Lembcke."[17] (Holz Tr. 14.) S.A. Sanchez-Gilbert told him they had talked to "Charles" and that he was not representing him, and repeated that statement.[18] (*Id.*)

When Mr. Holzendorf heard that he no longer had an attorney, he pulled over at a client's parking lot because he "was shocked" (Holz Tr. 15), "crashed" (Suppl. Tr. 70), and "was pretty much out of it" (Suppl. Tr. 26).[19] At the time he received the phone call, he was probably four or five miles from his home. (Supp. Tr. 40.) He testified that S.A. Sanchez-Gilbert told him they wanted to talk to him about a "deal"

---

[17] Mr. Holzendorf testified that Mr. Truncale's name did not come up in that conversation. (Suppl. Tr. 4.)

[18] Defendant contends that this was a critical "misstatement of law" that misled him and brings this case within *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) ("Police misrepresentations of law . . . are much more likely to render a suspect's confession involuntary."). (Suppl. Tr. 83; Doc. 68 at 14-15.) For reasons discussed herein, the Court disagrees.

[19] Mr. Holzendorf also stated: "I just didn't feel I had anybody at that point." (Supp. Tr. 70.)

privately and asked him if he could meet with them.  (Holz Tr. 15-16.)  When she said "deal," his mind "snapped," and he started thinking about Sharon Baker's deal because she was called in the same fashion when they gave her her plea agreement.  (Holz Tr. 15.)  He asked S.A. Sanchez-Gilbert if he could bring an attorney and her response was that they would not be able to discuss this with him if he had an attorney.  (Holz Tr. 16.)  He was given an ultimatum – if he did not meet with the agents that day, they could not make him an offer.  (Holz Tr. 16; Suppl. Tr. 41, 49.)  S.A. Sanchez-Gilbert asked him how soon he could be there and his response was in about 20 to 30 minutes.  (Holz Tr. 16-17.)

Because S.A. Sanchez-Gilbert called him while he was still on the phone with Mr. Gruszecki, he thought that his phone "was bugged."  (Holz Tr. 17; *see also* Suppl. Tr. 42.)  For that reason, once his call ended with S.A. Sanchez-Gilbert, he did not use his cell phone to call Mr. Lembcke, but rather used his client's office phone, but could not reach him.  (Holz Tr. 17.)  For the same reason, he did not tell Mr. Gruszecki he was heading to the FBI office, but rather told him that he was going to a client.[20]  (Holz Tr. 17-18.)  However, on cross-examination, Mr. Holzendorf conceded that he continued using his "bugged" phone after the interview numerous times and has never changed his number.  (Suppl. Tr. 42-47.)

Mr. Holzendorf testified that he arrived at the FBI field office between 2:10 and

---

[20] Mr. Holzendorf testified that he did not call S.A. Sanchez-Gilbert on that day. (Suppl. Tr. 4.)

2:15 p.m.[21]  (Suppl. Tr. 4.)  The visitor's log shows that he was admitted at the reception area at 2:25 p.m.  (Suppl. Tr. 9.)  He testified that seven to ten minutes later, the agents came out, greeted him, and thanked him for coming.  (Suppl. Tr. 10.)  They proceeded to the interview room.  (Suppl. Tr. 10-11.)  Before S.A. Sanchez-Gilbert sat down, she excused herself because she "either got a phone call or something on her phone."  (Suppl. Tr. 13.)  When she returned, she asked him: "[D]o you know why you are here?"  (*Id.*)  Mr. Holzendorf testified that his response was: "I'm here to get the deal you talked about on the phone," and that her response was "we will get to that, but we have some questions for you."  (*Id.*)

The agents' initial questions involved Morrison Homes employees David Ray and Paul Masciarelli, as well as Dale Griffin; then, they moved on to other topics, such as the purchase and sale contracts, the addendums, Defendant's condo purchase, and Chris Reid's transaction.  (Suppl. Tr. 13-18.)  After the exchange about Defendant's condo purchase, S.A. Sanchez-Gilbert allegedly excused herself for a second time.  (Suppl. Tr. 59.)

The next topic was "the plea deal."  (Suppl. Tr. 19.)  Mr. Holzendorf "was expecting the plea agreement she had talked about to be included in [S.A. Sanchez-Gilbert's] stack of papers that she had."  (Suppl. Tr. 14.)  However, he never saw a written plea agreement that day.  (Suppl. Tr. 63-64.)  S.A. Sanchez-Gilbert brought

---

[21] Both in his Motion and during his testimony, Defendant referred to the FBI office as the FBI "compound."  (Doc. 68; Holz Tr. 17.)

up that topic by saying that any kind of plea deal is going to require him to testify against other people, such as Mr. Gruczecki, and to plead guilty to a felony.  (Suppl. Tr. 19.)  Mr. Holzendorf told the agents: "I can't testify against Mark [Gruczecki]" and that he was "willing to take the felony, but [Mr. Gruszecki] needed to get the pass just like [the other defendants' spouses]."  (Suppl. Tr. 19-20.)  Mr. Holzendorf testified that S.A. Sanchez-Gilbert "excused herself again and at this point [he was] livid" because the agents were not respecting his relationship with Mr. Gruszecki.  (Suppl. Tr. 20-21.)  On re-direct examination, he clarified that his lividness was internal and that a person would not be able to tell he was mad just by looking at him.  (Suppl. Tr. 69-70.)  When S.A. Sanchez-Gilbert came back, she told him that was all they had for him.  (Suppl. Tr. 21.)

While at the FBI office, Mr. Holzendorf was not asked whether he had an attorney and was not told that he could leave at any time.  (Suppl. Tr. 21-22.)  Although he testified that he did not think he was there voluntarily (Suppl. Tr. 21), he also testified that he did not think he was going to be arrested on that day (Suppl. Tr. 35).  He conceded on cross-examination that he was not made any plea offer directly and he was not presented with a letter from the USAO outlining a plea offer.  (Suppl. Tr. 63-64.)  However, S.A. Sanchez-Gilbert "implied she did have the authority to work a deal" by saying that she had a deal for him and that he needed to come to their field office to discuss it.  (Suppl. Tr. 64.)  He did not offer to plead guilty to a particular transaction, but told the agents he knew that any kind of plea agreement

would result in him having to plead guilty.  (*Id.*)  He admitted that the agents never outlined a specific financial transaction for which he would have to admit his guilt. (Suppl. Tr. 64-65.)

Mr. Holzendorf walked out of the FBI building and was at the parking lot at approximately 5:25 p.m.  (Suppl. Tr. 24.)  At that point, he "got even more shocked because [he] saw [his] brother's best friend in the parking lot," who is a Jacksonville Sheriff's Office ("JSO") officer on loan to the FBI.  (*Id.*)  When he left, he called Mr. Gruszecki from his car at 5:28 p.m. and went straight to his parents' house rather than returning home to take his Xanax. (Holz Tr. 12; Suppl. Tr. 25.)  Mr. Holzendorf called Mr. Lembcke that evening (Suppl. Tr. 43), and talked with him the next morning (Suppl. Tr. 25).  He told Mr. Lembcke he had met with the agents "because they were offering a plea deal."  (*Id.*)

Defendant also presented the testimony of Mr. Truncale.  (Tr. 114.)  Mr. Truncale testified that in the summer of 2009, he received a phone call from Mr. Holzendorf who was seeking representation for himself and Mr. Gruszecki in regards to a criminal investigation.  (Tr. 115-16.)  When Mr. Holzendorf called, he had just finished talking with FBI agents who were talking with Mr. Gruszecki in the other room.  (Tr. 116, 121, 125.) Mr. Truncale advised Mr. Holzendorf to tell Mr. Gruszecki to stop talking to the agents.  (Tr. 121-22, 125.)  Mr. Holzendorf and Mr. Truncale agreed that they would all meet the following day so they could sign a contract retaining Mr. Truncale.  (Tr. 116.)  Mr. Truncale recalled this conversation well

because, among other things, it was lengthy and he and Mr. Holzendorf had several things in common.  (Tr. 120-22, 125.)

After the conversation, Mr. Truncale called the USAO to advise that he would be representing Mr. Holzendorf and Mr. Gruszecki, and that any further communications as to them should be directed to him.  (Tr. 117, 120, 125, 131.)  On the day of the scheduled meeting, Mr. Truncale called Mr. Holzendorf to confirm the meeting, but Mr. Holzendorf told him that he was in the process of hiring other counsel—someone his family knew or knew of.  (Tr. 116, 126, 129-30.)  Thus, the contract prepared by Mr. Truncale was never signed.  (Tr. 116, 118-20, 129, 131.)

Mr. Truncale further testified that during the summer of 2010, Mr. Frein called him to inquire if he was representing Mr. Holzendorf.  (Tr. 116-17, 120, 126, 130.) Mr. Truncale told Mr. Frein that he was not representing Mr. Holzendorf, and was "pretty certain" he told Mr. Frein that the reason he was not representing Mr. Holzendorf was because Mr. Holzendorf decided to seek other counsel after speaking with his parents.  (Tr. 118, 126-27, 131-33, 135.)  Mr. Truncale reiterated this statement several times.   (Tr. 126 ("I simply advised I was no longer representing him because he had gone to other counsel. . . . [I]t was totally appropriate for me to tell you that I'm not representing him because he went elsewhere."); 127 ("I believe I told you -- I'm pretty certain I told you why, that he went to other counsel."); 132 ("I'm pretty sure I told you exactly what it was, that the family wanted to go with someone that they knew."); 133 ("I felt you were entitled to

an explanation, and the explanation was exactly what Mr. Holzendorf told me, that although -- although we had an agreement that day that we spoke, it changed after he spoke with his parents, and it's -- yes, I told you that. I'm pretty sure I did. I'm certain I did."); 135 ("I did not know who was representing him at that time. . . . I didn't know for certain [if Mr. Holzendorf had an attorney].").)

### C. Credibility of the Witnesses

As an initial matter, the government's version and Defendant's version of the events, as set forth above, are so inconsistent with one another that the Court finds that the substantial differences between them cannot be explained just by mere differences in perception of the subject events. For instance, according to the government's version of the events, S.A. Sanchez-Gilbert explicitly asked Defendant whether he was represented by an attorney when she called him and reconfirmed that he was not just prior to the interview, she did not pressure him to meet with her and S.A. Holycross at a particular place or at a specific time, and neither she nor S.A. Holycross ever discussed a plea deal with Mr. Holzendorf. In short, she adamantly denied Defendant's assertions that she had misled him in any way, that she had told him he did not have an attorney, that she pressured him to meet with the agents immediately without an attorney to get a "deal," and that any plea deal was ever discussed. S.A. Holycross corroborated much of S.A. Sanchez-Gilbert's testimony, although he did not hear the entire phone conversation between S.A.

Sanchez-Gilbert and Mr. Holzendorf.[22]

Contrary to the agents' testimony, Defendant claims that the only time he was asked whether he was represented by an attorney was during the phone conversation with S.A. Sanchez-Gilbert and that his answer was that Mr. Lembcke represented him. He was then told that Mr. Lembcke no longer represented him. He further testified that S.A. Sanchez-Gilbert gave him an ultimatum—if he did not meet with her and S.A. Holycross on that day, within thirty minutes after she called him, and without an attorney, they could not make him a plea offer. Moreover, Defendant claims that he was enticed to meet with the agents based on their alleged promise to have a plea discussion with him and that such a discussion took place during his interview on August 2, 2010 but fell apart when the agents refused to respect his relationship with Mr. Gruszecki.

Considering the substantial differences between Defendant's testimony and the agents' recollection of the events, the Court can conclude only that one side or the other is either intentionally fabricating or misrepresenting facts in that side's favor, or that either Mr. Holzendorf's or the agents' perception of the subject events is so far from reality as to make any testimony based thereon not credible. In order to believe Defendant's testimony, the Court would have to disbelieve the testimony of both agents and conclude that they were intentionally misleading the Court.

---

[22] He did, however, hear S.A. Sanchez-Gilbert offer to meet with Mr. Holzendorf at his house. (Tr. 13.)

However, based on the witnesses' demeanor and the content of their testimony, the Court concludes that the agents' testimony is largely credible and Defendant's testimony largely is not. Thus, the Court accepts the government's version of the significant events on August 2, 2010.

The agents' testimony was largely consistent with each other and their version of the events is much more believable than Defendant's version. The timing discrepancies between the agents' testimony and the phone records admitted into evidence do not materially impact the agents' overall credibility. On the other hand, although portions of Defendant's testimony are somewhat corroborated by, for example, times indicated on cell phone records and the apparent lack of a second phone call between S.A. Sanchez-Gilbert and Mr. Holzendorf, the Court does not find Defendant's overall testimony credible, particularly after taking into account his obvious interest in the outcome of these proceedings and motivation to fabricate or extremely exaggerate the events in question.[23]

Just as examples of Defendant's lack of credibility, the Court finds it hard to fathom how Defendant, an intelligent, college-educated, forty-two-year-old person, with a significant work background and prior knowledge of the investigation and related proceedings, would go into a state of shock and panic after allegedly being told that he was no longer represented by an attorney. Even considering

---

[23] The Court also notes that if a witness was inclined to try to testify consistently with cell phone records in his or her possession, that witness could certainly do so.

Defendant's psychological issues and treatment, the Court declines to accept this testimony. Mr. Holzendorf testified that he educated himself by personally following the electronic filings in more than a dozen mortgage fraud cases prosecuted in this District through his PACER account. Although Mr. Holzendorf may have been "borderline . . . obsessed" with these proceedings, he "kind of like knew everything that was going on." (Holz Tr. 9.) Further, Mr. Holzendorf testified that he knew, as early as the summer of 2009 (after he spoke with Mr. Truncale on the phone on June 29, 2009), that he did not have to speak to law enforcement and that if he did, anything he said could be used against him. Thus, Defendant appears to have been very well informed and aware of his rights on August 2, 2010.

The Court also finds it unbelievable that after following the proceedings for months on PACER, Mr. Holzendorf would all of a sudden decide that he was "willing to take a felony" because "[j]ust at this point, [he] just wanted this matter over with," "was ready for this to be done" (Suppl. Tr. 19; Holz Tr. 16), and go to negotiate a plea deal without consulting with Mr. Lembcke or some other attorney before doing so. His willingness to go to the FBI field office is more consistent with his voluntary desire to diminish his culpability rather than to secure a coerced plea deal. Thus, regardless whether Mr. Lembcke did in fact represent Mr. Holzendorf on that day, Mr. Holzendorf made the knowing and voluntary decision to go to the FBI office and give a statement without an attorney.

The Court has also considered the testimony of Mr. Truncale and finds that

it does not alter the above findings. In short, even assuming that Mr. Truncale communicated to Mr. Frein that Mr. Holzendorf said he was going to look for another attorney in 2009, that only means that Mr. Frein and the USAO did not know on August 2, 2010 whether or not Mr. Holzendorf was represented.[24] This explains why the agents asked Mr. Holzendorf several times whether he was represented by an attorney, and why they included language to that effect in the FBI 302.[25]

Thus, based on the evidence presented, the Court concludes that regardless whether Mr. Holzendorf was or thought he was represented by Mr. Lembcke on August 2, 2010, he told the agents he was not represented, and he made the entirely

---

[24] The government's Response provides that the first time that anyone connected to Mr. Holzendorf's investigation knew of any representation by Mr. Lembcke of Mr. Holzendorf was on August 3, 2011 when the AUSA received a call from Mr. Lembcke indicating that he represented Mr. Holzendorf. (Doc. 78 at 7.) In its Response, the government disputes that Mr. Lembcke told the AUSA on that day that he had represented Mr. Holzendorf prior to August 2, 2010 and contends that Mr. Lembcke did not "address the government's actions denying Mr. Holzendorf his right to engaged counsel and misleading Mr. Holzendorf . . . ." (*Id.* at 7 n.2.) However, this portion of the Response is inconsistent with S.A. Holycross's testimony regarding an alleged conversation between Mr. Lembcke and AUSA John Guard ("Mr. Guard"), in which Mr. Lembcke did complain (*see* Tr. 48), but that testimony is hearsay within hearsay. Regardless whether Mr. Lembcke complained on August 3, 2010, the Court accepts that neither the USAO nor the FBI knew on August 2, 2010 that Mr. Holzendorf was represented by Mr. Lembcke or any other attorney.

[25] Similarly, the Court does not find Mr. Truncale's testimony regarding his experience with the USAO, and what, in his opinion, was usual or typical regarding contact with agents or other matters, or his opinion regarding whether Mr. Lembcke would or should have contacted the USAO to let it know he was representing Mr. Holzendorf, as bearing materially on the events of August 2, 2010. The Court accepts S.A. Sanchez-Gilbert's testimony that she did not discuss a plea deal for Mr. Holzendorf with Mr. Frein on that day. The Court also is not basing its recommendation in any way on Mr. Lembcke's failure to notify the USAO of his representation of Mr. Holzendorf.

conscious, voluntary, and knowing decision to talk with the agents, not under the impression of getting a plea deal, but out of a desire to exonerate himself or diminish his culpability. Therefore, the Court largely accepts the government's version of the events and finds the agents' testimony clearly more credible than Mr. Holzendorf's testimony.

### III. Analysis

#### A. Fed. R. Crim. P. 11(f) Does Not Require Suppression of Defendant's Statements Made on August 2, 2010

Defendant argues that the statements he made on August 2, 2010 must be suppressed pursuant to Fed. R. Crim. P. 11(f). (Doc. 68.) For the reasons stated herein, the Court finds that Rule 11(f) is inapplicable. First, Mr. Holzendorf's statements on that day were not "made in the course of plea discussions with an attorney for the prosecuting authority," Fed. R. Evid. 410, or with any agent for the government who had actual or apparent authority to negotiate a plea deal. Second, even under a "totality of the circumstances" approach, *Robertson*, 582 F.2d at 1366, Defendant did not exhibit a subjective expectation to negotiate a plea. Further, although the Court finds Defendant's credibility lacking, any actual subjective expectation on Defendant's part of negotiating a plea was clearly unreasonable based on the credible testimony of the agents regarding the events of August 2, 2010. Thus, the government has satisfied its burden of proving that Defendant's statements on that day were not made in the course of plea negotiations.

Rule 11(f) of the Federal Rules of Criminal Procedure provides that the admissibility "of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Fed. R. Crim. P. 11(f). Pursuant to Federal Rule of Evidence 410, "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty" is not admissible in any civil or criminal proceeding against the defendant who was a participant in the plea discussions. Fed. R. Evid. 410. The government "bears the burden of proving that the discussion was not a plea negotiation once the issue has been properly raised." *Robertson*, 582 F.2d at 1366 n.21.[26]

Under Eleventh Circuit precedent, "the automatic exclusion rule of [Rule 11] 'does not extend to statements made to law enforcement agents, as distinguished from government counsel.'" *United States v. Davidson*, 768 F.2d 1266, 1270 (11th Cir. 1985). *See also United States v. Godwin*, 296 Fed. App'x 744, 749 n.1 (11th Cir. Oct. 14, 2008) (per curiam) (same); *United States v. Kritzer*, 228 Fed. App'x 870, 874 n.1 (11th Cir. Apr. 10, 2007) (per curiam) (finding that a defendant's statements made only to law enforcement officials during a debriefing were not inadmissible under Rule 11 because they were not made "during a plea negotiation with a prosecuting authority, and the federal agent on the case specifically warned [the defendant] that he had no authority regarding the prosecution"); *United States v.*

---

[26] Plea negotiations are "discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions." *Robertson*, 582 F.2d at 1365.

*Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (finding that the questioning of a defendant "was an interrogation rather than plea negotiations" where only a law enforcement officer participated and the defendant was not told that the "agent had authority to enter into an agreement concerning the charges or sentence").

However, some cases indicate that "[e]ven if the government negotiator is not an attorney, the evidentiary rule excluding plea negotiations may apply" upon consideration of the totality of the circumstances. *United States v. Harris*, 657 F. Supp. 2d 1267, 1271 (N.D. Fla. 2009) (citing *Robertson*, 582 F.2d 1356).[27] It is unclear whether the holding of *Robertson* was affected by the 1979 amendment to Rule 11. The Advisory Committee Notes to Rule 11 state:

> The [1979] amendment makes inadmissible statements . . . "made in the course of any plea discussions with an attorney for the government . . . ." . . . It thus fully protects the plea discussion process authorized by [R]ule 11 without attempting to deal with confrontations between suspects and law enforcement agents, which involve problems of quite different dimensions. This change, it must be emphasized, does not compel the conclusion that statements made to law enforcement agents, especially when the agents purport to have authority to bargain, are inevitably admissible. Rather, the point is that such cases are not covered by the per se rule of 11(e)(6) and thus must be resolved by that body of law dealing with police interrogations.

Advisory Committee Notes to Fed. R. Crim. P. 11, 1979 Amendments (internal

---

[27] In *Harris*, the district court rejected "[t]he [g]overnment's argument that the statements must be admissible because they were not made to an Assistant United States Attorney or an agent with authority to negotiate for such an attorney." *Harris*, 657 F. Supp. 2d at 1274. The court emphasized that "the proper test examines the totality of the circumstances informing the defendant's belief, not the objective express authority of the government negotiator." *Id.*

citations omitted).

In light of this amendment, and later Eleventh Circuit cases which appear to adopt a more restrictive approach, the continued vitality of *Robertson* may be questioned. However, for purposes of this Report and Recommendation, the Court will apply the *Robertson* "totality of the circumstances" approach.

In *Robertson*, the former Fifth Circuit stated:

> To determine whether a discussion should be characterized as a plea negotiation and as inadmissible, the trial court should carefully consider the totality of the circumstances. . . . The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances. . . . For example, if the accused unilaterally offers to "plead guilty," or to "take the blame," in exchange for a government concession, then the policy underlying Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410 is served only if the discussions are held inadmissible. . . . In those situations . . . , in which the record does not disclose a clear expression of a subjective intent on the part of the accused to pursue plea negotiations, the accused's after the fact expressions of his intent must be more carefully evaluated. The trial court must focus searchingly on the record to determine whether the accused reasonably had such a subjective intent, examining all of the objective circumstances.

*Robertson*, 582 F.2d at 1366-67 (internal citations omitted).

Here, it is undisputed that Defendant's interview was conducted only by law enforcement agents, not by "an attorney for the prosecuting authority." Fed. R. Evid. 410. Moreover, the agents did not have actual authority from the USAO to negotiate a plea with Defendant, did not tell him otherwise, and based on the credible evidence of record, no plea discussions ever took place. (*See, e.g.*, Tr. 28, 45-46,

86, 102, 104, 107-08; *see also* Tr. 64-65 (S.A. Sanchez-Gilbert testified that she did not discuss with the AUSA the possibility of making a deal with Defendant prior to the interview on August 2, 2010.)[28].)  Further, Defendant's testimony shows that he was not offered a plea deal or presented with a letter from the USAO outlining a plea agreement, and that he did not offer to plead guilty to any particular transaction. (Suppl. Tr. 63-65; *see also* Tr. 107.)

Defendant asserts that S.A. Sanchez-Gilbert "implied she did have the authority to work a deal" by saying that she had a deal for him and that he needed to come to their office to discuss it  (Suppl. Tr. 64.)  However, because the Court does not find Defendant's version of the events credible, it does not believe that S.A. Sanchez-Gilbert ever mentioned a "deal," or otherwise implied she had authority to negotiate a plea bargain.  It is more likely that Defendant went to the FBI office to attempt to diminish his culpability or exonerate himself.

Furthermore, based on the evidence, the Court cannot conclude that Defendant exhibited an actual subjective expectation to negotiate a plea and that such an expectation was objectively reasonable.  Although Defendant cites to, *inter alia*, *Harris*, 657 F. Supp. 2d at 1273-74, a case in which the district court found that a defendant's subjective expectation to negotiate a plea was reasonable, the circumstances in *Harris* were much different.  In that case, the defendant "did not

---

[28] As stated earlier, the Court accepts S.A. Sanchez-Gilbert's testimony that she did not discuss a plea deal for Mr. Holzendorf with Mr. Frein on August 2, 2010.

make any inculpatory statements *until he had secured a specific bargain* from an agent of an organization with which he had a ten-year cooperative relationship." *Id.* at 1273 (emphasis added) ("Expressly stating that he did not want to say anything to incriminate himself, Mr. Harris made inculpatory statements only after Agent Ward promised him that, while he might face charges, he would not have to face federal indictment.").  In contrast, here, there was no "bargaining process, a 'mutuality of advantage,' and a mutuality of disadvantage," *Robertson*, 582 F.2d at 1366 (internal citations omitted), because Mr. Holzendorf did not secure, or even attempt to secure, any bargain from the agents at any point of time.  Thus, even the discussions at the end of the interview regarding the possibility of Defendant testifying against others, cannot be seen as plea negotiations because there was no discussion of any plea or any bargain resulting therefrom.

Finally, even assuming Defendant had any actual subjective expectation of negotiating a plea deal, which the Court does not believe, such an expectation was clearly unreasonable, based on the credible testimony of the agents that no plea deal was ever brought up or discussed at any time with Defendant that day. Moreover, the Court rejects Defendant's "circumstantial evidence" argument that certain circumstances show that a plea deal was likely discussed.  Such circumstances include the phone call between S.A. Sanchez-Gilbert and Mr. Frein, the impending trial of Christopher Reid and Timothy Miller, the close timing between Mr. Holzendorf's telephone conversation with S.A. Sanchez-Gilbert and his arrival

at the FBI office, the lack of a record of a second phone call between S.A. Sanchez-Gilbert and Mr. Holzendorf prior to the interview, and Mr. Lembcke's complaints to the USAO the next day. However, these circumstances do not overcome the credible testimony of the agents that no plea deal was ever discussed.

For all of the foregoing reasons, Mr. Holzendorf's statements made on August 2, 2010 are not subject to exclusion pursuant to Rule 11 as statements made in the course of plea discussions. In light of this finding, the Court will address Defendant's alternative argument that his statements made on August 2, 2010 should be suppressed as involuntary because the agents allegedly coerced and/or tricked him into talking with them. (Doc. 68.)

### B. Defendant's Statements Made on August 2, 2010 Were Voluntary and, Therefore, Should Not Be Suppressed

First, regarding the burden of proof, the government must prove "by a preponderance of the evidence, that a challenged confession was voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). Thus, to the extent Defendant argues that *Sims v. Georgia*, 385 U.S. 538 (1967), and *Davidson*, 768 F.2d 1266, establish that the government's burden is "clear and convincing evidence," the Court rejects that argument. (*See* Holz Tr. 98 (stating that "since the government has the burden on voluntariness, to prove it clearly -- and this Court has to find it's clear from the record").) Neither *Sims* nor *Davidson* stands for the proposition that the government's burden of proof is

clear and convincing evidence; rather, both decisions provide that the court's "conclusion that the confession is voluntary must appear from the record with unmistakable clarity." *Sims*, 385 U.S. at 544; *Davidson*, 768 F.2d at 1270. The Court intends to be very clear that Defendant's statements on August 2, 2010 were voluntary.

In conducting the voluntariness inquiry, courts consider the following:

The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial. We focus our voluntariness inquiry on whether the defendant was coerced by the government into making the statement: The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. The district court must consider the totality of the circumstances in assessing whether police conduct was causally related to the confession. Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment. Absent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*United States v. Thompson*, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (internal citations and quotation marks omitted).

Moreover, "[i]solated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice." *Jones*, 32 F.3d at 1517 (finding no coercion in a defendant's interview and confession where the defendant was not promised

leniency in exchange for his statements, the agents did not threaten him, and repeatedly informed him that "they had no ability to affect the charges brought against him"). *See also Lall*, 607 F.3d at 1285 (stating that "a per se rule that would render a confession involuntary if it was preceded by 'any direct or implied promises, however slight,' has been rejected by the Supreme Court"); *Davidson*, 768 F.2d at 1271 (finding that the agent's statement that "he couldn't promise anything, but that if [the defendant] did cooperate with substantial assistance the U.S. Attorney could recommend a shorter sentence . . . in itself did not render [the defendant's] subsequent confession involuntary"). Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In *Connelly*, the Supreme Court squarely rejected the argument that coercion flowing from a different source, such as an accused's confused mental state, renders a statement constitutionally involuntary. *See id.* at 170-71.

Defendant argues that his statements on August 2, 2010 were involuntary because he was deceived by the agents' alleged misrepresentations of law that he was not represented by counsel and that he could not bring an attorney to the interview.[29] (Doc. 68 at 14-15.) He contends that these alleged misrepresentations

---

[29] Defendant makes no argument that *Miranda* warnings were required prior to his August 2, 2010 interview. Rather, Defendant appears to concede that there was no

(continued...)

of law bring this case within *Lall*, 607 F.3d at 1285.  (Suppl. Tr. 79-80; Doc. 68 at 14-15.)

First, as previously indicated, the Court does not believe that these statements were ever made.  S.A. Sanchez-Gilbert did not tell Mr. Holzendorf he no longer had an attorney and she did not tell him that he could not bring an attorney to the interview.  Moreover, the Court finds nothing deceptive, coercive, or intimidating about any of the agents' actions or the circumstances on August 2, 2010.  Thus, *Lall* is clearly distinguishable.

In *Lall*, the Eleventh Circuit observed:

> [Misrepresentations of fact] are not enough to render a suspect's ensuing confession involuntary . . . .  Police misrepresentations of law, on the other hand, are much more likely to render a suspect's confession involuntary.

607 F.3d at 1285.  Based on the circumstances of that case, including that the detective assured the defendant that "anything he said would not be used to prosecute him" and that "there [was] ample record evidence to support a finding that

---

[29](...continued)
custodial interrogation of him.  (Doc. 68 at 13 ("Non custodial interrogation can create the basis for an involuntary coerced confession.").)  Nevertheless, the Court finds that no such warnings were necessary because Defendant was not in custody during the interview.  *See, e.g.*, *Bobby v. Dixon*, 132 S. Ct. 26 (Nov. 7, 2011) (per curiam) (stating that the Supreme Court "has never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than custodial interrogation").  The Court is satisfied that Mr. Holzendorf was not subject to "custodial interrogation" because he voluntarily came to the FBI office and was free to leave at any time.  (Tr. 18-19, 22-23, 38-39, 105-06; *see also* Suppl. Tr. 2, 9.) Moreover, Defendant testified that he did not think he would be arrested on that day. (Suppl. Tr. 35.)

[the detective's] promise was deceptive," the court found that the defendant's confession was involuntary. *Id.* at 1287. The court explained:

> It is inconceivable that [the defendant], an uncounseled twenty-year-old, understood at the time that a promise by [the detective] that he was not going to pursue any charges did not preclude the use of the confession in a federal prosecution. Indeed, it is utterly unreasonable to expect any uncounseled layperson, especially someone in [the defendant's] position, to so parse [the detective's] words. On the contrary, the only plausible interpretation of [the detective's] representations, semantic technicalities aside, was that the information [the defendant] provided would not be used against him by [the detective] or anyone else. Under these circumstances, [the detective's] statements were sufficient to render [the defendant's] confession involuntary . . . .

*Id.*

The agents made no such representations or assurances in this case. Had the agents in fact told Mr. Holzendorf that he no longer had an attorney and could not bring one to the interview, this case might still be distinguishable from *Lall*, but the Court need not engage in that analysis based on its finding that no such statements were made.

Moreover, although during the relevant time Defendant apparently had been diagnosed as "bipolar," and had been prescribed medications, the Court does not find that such condition or treatment had any significant impact on his actions and/or perception of the events occurring on August 2, 2010. The Court's finding is based on Defendant's testimony that he could and did function normally on August 2, 2010. (Suppl. Tr. 38-39; Holz Tr. 11.) He was meeting with clients that day, he was driving and multi-tasking, and the agents testified that he conducted himself in a "normal,"

friendly, and cooperative manner, answered their questions appropriately, and remained articulate and alert during the entire interview. (Tr. 16, 25, 28, 88, 105-07; *see, e.g.*, Holz Tr. 12, 17-18, 38.) Although Defendant was under the care of both a psychiatrist and a psychologist and was taking Wellbutrin and Xanax (Holz Tr. 10-11; Suppl. Tr. 38), he testified he could function with or without his medications (Holz Tr. 68). Moreover, it is undisputed that Defendant did not tell the agents he had been diagnosed with bipolar disorder or that he had not taken his Xanax on that day.[30] (Holz Tr. 40.) Thus, even assuming that Mr. Holzendorf's actions on August 2, 2010 were affected by what he describes as a "manic" state of mind,[31] *Connelly* makes it clear that "a defendant's mental condition, by itself and apart from its relation to official coercion, should [not] ever dispose of the inquiry into constitutional voluntariness." *Connelly*, 479 U.S. at 164.

Finally, the Court does not find that the length and nature of the questioning, any actions by the agents, or any other pertinent factors, indicate that Mr. Holzendorf's will was overborne by the government or even otherwise. First, the

---

[30] Thus, this case is distinguishable from *Thompson* where the defendant asserted "that her confession was involuntary because the officers who interrogated her denied her request for Lorcet, a prescription narcotic drug that was removed from her home, until after she made an inculpatory statement." 422 F.3d at 1295.

[31] Mr. Holzendorf testified:
Usually when I'm manic it's like I have to try to please people. I just got to get to that point where, you know, stop being mad at me. Then, therefore, that's when I go out and I do stuff that shouldn't be done because I'm trying to get those people to want me to be around them again.
(Suppl. Tr. 69.)

interview lasted less than three hours.  (Tr. 20, 28-29, 37, 89, 107; Suppl. Tr. 24.)

Defendant drove himself to the FBI field office after rejecting an offer from S.A.

Sanchez-Gilbert to meet at his home or any other convenient location instead.  (*See,*

*e.g.*, Suppl. Tr. 4.)  The agents thanked him for coming and told him he could leave

at any time.  (Tr. 18-19, 22-23, 38-39, 105-06; Suppl. Tr. 10.)  Neither agent

displayed any weapon and S.A. Sanchez-Gilbert, who was seven or eight months

pregnant, did not have a firearm on her.  (Tr. 6, 8, 20-21, 105.)  During the interview,

Defendant was not promised anything and was not threatened.  (Tr. 107.)  He

remained very cooperative, pleasant, articulate, and alert during the entire interview.

(Tr. 16, 25, 28, 88, 105, 107.)  Even accepting that the interview room was small and

windowless, and that Defendant believed he might need an agent's assistance to

leave the "compound," these circumstances do not support the conclusion that

Defendant's will was overcome, particularly as a result of any government action.

(*See, e.g.*, Tr. 20.)  In short, the government has satisfied its burden to show that Mr.

Holzendorf's statements on August 2, 2010 were voluntary.  Therefore, based on the

foregoing, the Court clearly and unequivocally finds that Defendant's statements

made on August 2, 2010 were completely voluntary and, thus, should not be

suppressed.[32]

---

[32] *See Sims*, 385 U.S. at 544 (stating that the court's "conclusion that the confession is voluntary must appear from the record with unmistakable clarity"); *Davidson*, 768 F.2d at 1270 (same).

## IV.    Consideration of Additional Evidence

The original Report and Recommendation on the Motion was entered on December 22, 2011.  (*See* Doc. 96.)  On January 5, 2012, Defendant filed a Motion to Supplement the Record Regarding His Motion to Suppress His Statements of August 2, 2010, or In the Alternative for the Court to Order an Additional Hearing Regarding the Additional Evidence ("Motion to Supplement") (Doc. 98), which the government opposed (*see* Doc. 103).  On January 11, 2012, the Court entered an Order granting the Motion to Supplement to the extent that Exhibit 1 to that Motion was accepted as evidence as part of the record of the hearing on the present Motion.  (Doc. 104.)  This Exhibit indicates, *inter alia*, that on August 2, 2010, at 13:59, Mr. Holzendorf called Mr. Lembcke from an office phone of one of Mr. Holzendorf's clients.  (*See* Doc. 98 at 7.)  This exhibit is consistent with Mr. Holzendorf's testimony at the hearing.  Subsequent to that Order, this matter was recommitted to the undersigned for an amended report and recommendation in light of this additional evidence.  (Doc. 105.)

Upon consideration of this additional evidence, the undersigned enters this Amended Report and Recommendation, which is identical to the original one except for the addition of this Part IV, of footnote two, and of footnote nine and as noted therein; the deletion of the paragraph quoted in full below (including original footnote twenty-two); and the deletion of the italicized language indicated below.  The omitted paragraph is as follows:

In addition, the Court finds it difficult to believe that Defendant called Mr. Lembcke from an office phone, immediately after speaking with S.A. Sanchez-Gilbert and before heading toward the FBI field office, because he thought that his cell phone was "bugged." As brought out by the government on cross-examination, Defendant has continued to use his "bugged" phone up to the day of the hearing, and made and received numerous phone calls immediately following his interview on August 2, 2010, including to Mr. Lembcke. The Court thinks it more likely that this testimony is an after-the-fact attempt to justify the lack of a call to Mr. Lembcke on Mr. Holzendorf's cell phone records. The Court finds it more likely that Mr. Holzendorf never called Mr. Lembcke before he went to the FBI office that day because he had not been threatened, misled, or coerced by the agents in any way and he perceived an opportunity to make a statement that he thought would help him.[22] [Footnote 22: Similarly, the Court is skeptical of Defendant's testimony that he did not tell Mr. Gruszecki that he was going to the FBI office after he got off the phone with S.A. Sanchez-Gilbert. (Holz Tr. 17-18.)]

(Doc. 96 at 23.) In addition, the following italicized language is omitted:

Thus, based on the evidence presented, the Court concludes that regardless whether Mr. Holzendorf was or thought he was represented by Mr. Lembcke on August 2, 2010, *or even whether he did try to call Mr. Lembcke before the interview*, he told the agents he was not represented, and he made the entirely conscious, voluntary, and knowing decision to talk with the agents, not under the impression of getting a plea deal, but out of a desire to exonerate himself or diminish his culpability.

(*Id.* at 25 (emphasis added).)

The additional evidence does not change the ultimate recommendation that the Motion be denied. Moreover, it does not change the Court's overall assessment of the credibility of the witnesses, including Mr. Holzendorf. In fact, the original Report and Recommendation recognized the possibility that the subject phone call from Defendant to Mr. Lembcke may have been made. (*See id.* at 23, 25

(concluding "that regardless whether Mr. Holzendorf was or thought he was represented by Mr. Lembcke on August 2, 2010, *or even whether he did try to call Mr. Lembcke before the interview*, he told the agents he was not represented, and he made the entirely conscious, voluntary, and knowing decision to talk with the agents") (emphasis added).) Further, although the Court previously found "it difficult to believe that Defendant called Mr. Lembcke from an office phone" that day (*id.* at 23), this was only one out of a number of reasons for the Court's decision to accept the agents' version of the events as more credible than Defendant's. (*See id.* at 22-24 ("*Just as examples of Defendant's lack of credibility*, . . . .") (emphasis added).)

The Court has also considered again whether the fact that this phone call was made should materially alter its assessment of the credibility of the witnesses, and concludes that it should not. Although the new evidence shows that the call was made, it does not show why the call was made. There are a number of potential reasons why Defendant made the call, including the seeking of advice from Mr. Lembcke. The Court still rejects Mr. Holzendorf's testimony that he made the call to see whether Mr. Lembcke still represented him after being told by S.A. Sanchez-Gilbert that he no longer had a lawyer. (Holz Tr. 14, 17.) However, even assuming Mr. Holzendorf was confused after his conversation with S.A. Sanchez-Gilbert because there were two attorneys involved named "Charles," the Court still finds the agents' overall testimony more credible than Mr. Holzendorf's. The agents' testimony indicates that there was never any intimidation, coercion, or deception by

them, and, therefore, the Court again finds Defendant's statements voluntary. In addition, the Court again finds that the discussions between Defendant and the agents were not plea negotiations within the meaning of Rule 11(f). In sum, Defendant's additional evidence does not change the Court's credibility analysis or ultimate recommendations.

## RECOMMENDATION

Accordingly, it is respectfully recommended that the Motion (**Doc. 68**) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on January 18, 2012.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record